Filed 1/13/16  In re A.W. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re A.W., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>K.W.,<br><br>　　　Defendant and Appellant. | A144863<br><br>(San Francisco County<br>Super. Ct. No. JD13-3063) |

**MEMORANDUM OPINION**[1]

Father appeals from the juvenile court's order terminating his parental rights. (Welf. & Inst. Code, § 366.26.)[2]  The sole issue on appeal is whether the trial court abused its discretion by refusing to find circumstances warranting application of the continuing beneficial relationship exception to termination of parental rights codified in section 366.26, subdivision (c)(1)(B)(i).  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)  We affirm the court's order.

---

[1] We resolve this case by a memorandum opinion pursuant to California Standards of Judicial Administration, section 8.1(1), (3).

[2] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

## SUMMARY OF HISTORICAL AND PROCEDURAL FACTS[3]

A.W. was born in April 1999 to substance abusing parents and was removed from their care. As a result of in utero exposure to drugs, A.W. is significantly developmentally delayed and has special needs. Father, who himself suffers from developmental delays as well as drug-related cognitive, emotional, and behavioral difficulties, was given sole legal and physical custody of A.W. by the court in August 2001. The San Francisco Human Services Agency filed a dependency petition and removed the minor from father's custody in March 2013 for general neglect and caretaker incapacity. A.W. was often seen with urine and feces on his clothes; father had used corporal punishment on A.W. in front of his schoolmates, and allowed A.W. to be consistently truant.

The petition was sustained and the court ordered reunification services. At the six-month review hearing, reunification services were extended for an additional six months. At the 12-month review hearing, the court found father had made progress in acquiring life skills and was devoted to his son; however, father had failed to demonstrate an ability to respond to A.W.'s developmental and emotional needs, even in the context of therapeutic visitation, much less in the outside world.

On July 11, 2014, the court terminated reunification services, made the requisite findings, and set a permanency planning hearing pursuant to section 366.26 for November 12, 2014.

The court ordered continued visitation, with the hope that "the relationship be encouraged to grow, [and] that father develop into the most nurturing . . . person he can be." Therapeutic visitation had been occurring twice a week and, according to the social

---

[3] We draw some of the facts and history from our prior unpublished opinion in this matter (*K.W. v. Superior Court* (Oct. 9, 2014, A142557)). Inasmuch as the parties are well acquainted with the protracted history of this case, we will limit our summary to the facts we deem necessary to our discussion of father's claim.

worker, "the dad was very consistent . . . dad faithfully came," but "titration" of visits was contemplated, since at some point family therapy visits would end.

On July 22, 2014, foster mother, A.W.'s attorney, father, father's attorney and A.W.'s and father's treatment teams met to discuss a titration schedule for visits. The consensus was that the minor's "long-term relationship with his father is very important for his emotional and behavioral well-being," and that the "reduction in visits needs to be gradual in order to help [A.W.] adjust to all the changes." Three-hour weekly visits were to continue until school started, and then would be reduced to two hours per week beginning the week of August 18, with a view towards ending therapeutic family visits in November after the hearing.

Father filed a timely writ petition. On October 9, 2014, this court found reasonable services had been provided and denied the petition on the merits. (*K.W. v. Superior Court*, *supra*, A142557.)

The social worker's report for the November 2014 hearing recommended termination of father's parental rights and contains the following salient information. A.W., then 15 years old, looked eight or nine years old, functioned at a kindergarten or first grade level, and was a high school freshman in special education classes. He has an autism diagnosis.

Father had lost two other sons to adoption, and had lost custody of a third son, now an adult. There were no referrals regarding A.W. from the time A.W. was returned to father's custody (in 2001) until 2009, but there had been eight referrals concerning feces and urine on A.W.'s clothing between 2009 and the Agency's resumption of control in 2013. Father admitted that after regaining custody of A.W. in 2001 "he went right back to methamphetamines and the unstable and unsafe life that led to [A.W.'s] second dependency." Father did not start going to drug treatment until nine months into the reunification period. Even then, father's counselor at Walden House reported he was not serious about his sobriety at first. He seemingly became serious around the time

3

reunification services were terminated in July 2014.  Although he never attended individual therapy during the year he had services, he began to see a therapist in the community after services were terminated.

A.W. has been with his foster mother since March of 2013.  She wishes to adopt him.  She offers A.W. a spacious home and a stable income.  She understands she would be fully responsible for A.W. after adopting him and that "[i]t is likely that [A.W.] will have to stay with [her] for the rest of her life.  She has a large and loving extended family who have made plans to take [A.W.], should [foster mother's] health fail or some other unforeseen health episode come along.  [She] not only is willing to care for [A.W.] for the rest of her life, but she enjoys doing it, and loves him totally for just the person that he is."  In the social worker's opinion, the foster mother has "the skills and the capacity and the proven track record" to "manage [A.W.'s] struggles with morality, with sexuality and with interpersonal relationships."

The social worker arranged for father to have an unsupervised visit with A.W. at Walden House.  Father's counselor reported that father took the opportunity to tell A.W. that his foster mother was a bad woman and he should not listen to her.  A.W. was so upset he ran out of the room and locked himself in a bathroom.  Father showed no remorse or sorrow for hurting his child's feelings.

The Consortium for Children worked with A.W.'s foster mother and his father to find a way to accommodate visitation after the permanency planning hearing.  However, they were not able to reach an agreement for postadoptive contact, and visits were to end after the hearing.  The social worker told A.W. the visits with his father would end in November and he would live with his foster mother, foster brother, and the two dogs after he was adopted.  A.W. reportedly said, "It is ok with me that I won't see my dad anymore.  He can't take care of me.  That is what the judge said."  He said he loved his foster mother, she loved him, and she could take care of him, his brother, and the two dogs.

4

At the permanency planning hearing held March 23, 2015, the court heard from the social worker and four additional witnesses about the nature of the bond between father and A.W.  The social worker testified that A.W. continued to live with his foster mother and father continued to have two hours of visitation supervised by an intern from A Better Way once every two weeks.  The social worker had observed a recent visit at which father had thrown toys and said disturbing things such as, "[S]chools aren't always safe.  Sometimes there's shootings at school."  She also observed him at a recent IEP (individualized educational plan) meeting.  Father appeared to know very little about A.W.'s school day or academic struggles.  The social worker did not believe there was a parental bond between father and child.  Although father was invested in getting his own unmet emotional needs met through his children, he was not reciprocally involved with the child in terms of being the competent person on whom the child could rely, the person who provides safety, or to whom the child looked for direction and emotional support.  She characterized the bond as a fondness between them, "more like maybe an uncle or [an] older brother kind of relationship."  While she believed there was a biological need in all people to know their parents, because of A.W.'s disabilities it was difficult for him to convey what he was going through emotionally.  She could not say there would be no detriment from the loss of parent, but she could not tell how much.  She did think the relationship he had with his soon-to-be-adoptive foster mother was "a much more parental appropriate, security-producing, happy, complete relationship which meets his needs to have a parent."  She felt strongly A.W.'s need for permanency with foster mother outweighed any detriment he would potentially suffer from the termination of father's parental rights.

Dr. Ann Chu is a psychologist and program director for A Better Way, a San Francisco mental health program.  She testified as an expert in clinical psychology with special training in child trauma and parent-child attachment issues.  She supervised the individual and family therapists at that program.  She opined that there was an attachment

5

between A.W. and his father, but could not speak to the quality of the attachment because she had not done an extensive attachment protocol. "But behaviorally, we did observe that [A.W.] was very much connected to his father and worried about his father and tracked his father's well-being and physical whereabouts; so all the signs we would want in looking for a bonded relationship between a parent and a child." Since A.W. did not usually tell his therapists verbally how he was doing, they had to infer a lot of his functioning from his behaviors. After visits between A.W. and his father were reduced, A.W.'s behavior deteriorated. Given A.W.'s cognitive limitations, she really could not predict what his response would be to the loss of his relationship with his father, but "he would be at high risk for increased anxiety along with other deteriorations in his functioning," i.e., "acting out behavior."

The intern from A Better Way testified she had been A.W.'s individual therapist for about a year. She had seen both A.W. and father in family therapy four times since January. A.W. became anxious and his behavior regressed during a period of many changes in his life, one of which was the reduction of visitation with his father. He would ask if he was seeing his father when he came for individual therapy. When he saw his dad in the waiting room, A.W. would run to him, give him a hug and converse about his day. Based on her observations of A.W., this witness wrote in October 2014 that A.W. showed a significant and strong attachment to his father. In the previous week's therapy session, A.W. said he would feel "lousy" if he could not see his father, and his play became aggressive and disorganized.

The former family therapist for A.W. and father from A Better Way testified. She supervised their therapeutic visitation from August 2014 to January 2015. From observing their interactions before, during, and after family therapy sessions, the therapist concluded father and son shared a continuing bond. They were appropriately playful; and father would teach his son life skills, such as opening a locker at school or coping with bullying in a healthy way. Father had learned how to direct A.W. using a firm but gentle

6

tone of voice. She could not provide an opinion about the impact on A.W. if he lost the relationship with his father, but she could say they had a safe and healthy relationship. She was not a bonding specialist.

It was stipulated father was participating in drug treatment and was living in a clean and sober environment. Father's Dependency Drug Court case manager testified all drug tests had been negative since the last hearing.

In argument, A.W.'s attorney joined in the Agency's recommendation that father's parental rights be terminated.

The court found by clear and convincing evidence that the minor is likely to be adopted by the person named in the section 366.26 report. The court also found that while "there is a benefit and . . . there is a relationship" between the minor and his father, that benefit and that relationship did not overcome the statutory preference for adoption. The court then terminated mother's and father's parental rights.

## DISCUSSION

Section 366.26 provides in relevant part: "If the court determines . . . by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption . . . unless . . . [¶] . . . [¶] [t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

Father contends this exception to adoption as the statutorily preferred permanent plan applies here because he maintained regular, loving visitation with the minor and as a result they share such a strong bond that A.W. would benefit from continuing their relationship. We disagree.

7

We review the juvenile court's order for abuse of discretion.[4] (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351.) Abuse of discretion means the trial court's decision exceeded the bounds of reason. When competing inferences can be reasonably deduced from the facts, the reviewing court will not substitute its decision for the trial court's. (*In re Emmanuel R.* (2001) 94 Cal.App.4th 452, 465.) In other words, our review is of necessity deferential.

The essential facts are not in dispute. The minor is likely to be adopted by the foster mother with whom he has lived since 2013. She loves him and he loves her. The minor lived with father from 2001 to 2013. They have a relationship, and the minor and father care for each other. Father maintained regular visitation with the minor throughout the dependency proceedings, but never progressed beyond supervised visits. They had one unsupervised visit after reunification services were terminated, and it ended disastrously. Because of the minor's profound disabilities, no one could predict exactly how the minor would respond to the end of contact between him and father, but the minor is likely to feel anxious and engage in acting-out behaviors.

The beneficial parent/child relationship exception means "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.

[4] Whether review of the juvenile court's order is for substantial evidence (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576) or for abuse of discretion (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351), or a combination of both (*In re K.P.* (2012) 203 Cal.App.4th 614, 621–622), the result is the same in this case. We apply the abuse of discretion standard here because the parties agree it is appropriate.

[¶] Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

"The [§ 366.26, subd. (c)(1)(B)(i)] exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H., supra,* 27 Cal.App.4th at pp. 575–576.) Here, father argues the length of time between dependencies during which the minor lived with father, his faithful and regular visitation, the positivity of most of their interactions, and his compliance with much of his case plan, all militate in favor of finding that father and son maintained so strong a bond that the statutory preference for adoption was overcome.

However, other factors weigh against that conclusion. A.W.'s life with father was far from idyllic. Father returned to using drugs almost immediately after A.W. was returned to him. Starting in 2009, there were consistent reports that A.W. was wearing urine-stained and feces-encrusted clothes. He was often truant from school. At the age of 13, he was not yet potty trained. As A.W. grew older, father clearly became less able or willing to attend to A.W.'s special needs. It is true father visited regularly with A.W., but he was never able to get beyond supervised, therapeutic visits. When father did get an unsupervised visit, it only demonstrated that, despite the many therapeutic visits in which he had participated, he had not learned to put his son's best interests before his

9

own. He continued to act inappropriately (throwing toys) and say inappropriate things (school shootings) during recent therapeutic visits. Father points to his partial compliance with his case plan, such as participating in Dependency Drug Court, completing a residential drug treatment program, and testing negative for drugs, but he only achieved these milestones after reunification services were terminated. Finally, not one of father's witnesses was able to pinpoint with specificity what harm A.W. would suffer, except that A.W. told one witness he would feel "lousy." Dr. Chu, who did not have direct contact with A.W., opined A.W. would likely feel anxious or act out, but did not say how long such anxiety or acting out behaviors would last. None ventured the opinion that whatever sadness or anxiety A.W. would naturally feel when visits ended with his father was greater than the benefit he would receive from adoption into a stable home.

Father argues "[t]he same emotionally significant attachment found in *In re S.B.* [(2008) 164 Cal.App.4th 289], is apparent here," but save for the similarity that the minors in both cases lived with their parents for considerable periods of time prior to the dependency, the cases are distinct. In *In re S.B.*, the minor's father was her primary caregiver for the first three years of her life. (*Id.* at pp. 293, 298.) He had complied with every aspect of his case plan but was unable to reunify with S.B. and assume full-time care for her because of poor physical health and combat-related posttraumatic stress disorder. He visited with S.B. three times a week. (*Id.* at pp. 293–294.) Her primary caretakers during the dependency were her maternal grandparents. (*Ibid.*) The minor expressed the wish to live with her parents *and* grandmother. (*Id.* at p. 295.) The doctor who conducted a bonding study concluded the bond between S.B. and her father was strong enough that there was a potential for harm to S.B. from severing the relationship with him. (*Id.* at p. 296.) The trial court recognized S.B. had " 'an emotionally significant relationship' " with her father (*id.* at p. 298), and based its decision to terminate parental rights in part on its understanding the grandparents were willing to

continue to allow the father to visit, an unenforceable promise. (*Id.* at p. 300.) In reversing the trial court's order terminating parental rights, the Court of Appeal observed: "The record here fully supports the conclusion [the father] continued the significant parent-child relationship *despite* the lack of day-to-day contact with S.B. after she was removed from his care." (*In re S.B.,* at p. 299.)

Here, by contrast, father was not prevented from reunifying with the minor by circumstances beyond his control, and the trial court did not base its decision in any part on an unenforceable promise by the adoptive parent to permit visitation; in fact, efforts to secure postadoption visitation had failed. In our view, the trial court did not err in concluding that the potential harm A.W. might suffer from the severance of his relationship with his father did not overcome the benefit he would receive from the stability and safety of his adoptive home. The evidence fully supports the trial court's conclusion that father's regular, supervised visits provided an incidental benefit to A.W. and their cessation would cause some undeterminable sadness, but severing the relationship would not deprive the minor of such a substantial, positive emotional attachment that the minor would be greatly harmed. On these facts, the court's decision was not unreasonable, and no abuse of discretion appears. (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351.)

**DISPOSITION**

The juvenile court's orders are affirmed.

_____

DONDERO, J.

We concur:

_____

MARGULIES, Acting P.J.

_____

BANKE, J.

A144863

12